*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

EDMON ARMSTRONG, JR.,

        Plaintiff-Appellant,

v

PROGRESSIVE MARATHON INSURANCE
COMPANY,

        Defendant-Appellee,

and

LAUREN CRAWFORD,

        Defendant.

UNPUBLISHED
December 23, 2025
11:47 AM

No. 373155
Oakland Circuit Court
LC No. 2023-203888-NI

Before: ACKERMAN, P.J., and BORRELLO and LETICA, JJ.

PER CURIAM.

In this case arising from a motor-vehicle accident, plaintiff appeals as of right the trial court's stipulated order of dismissal. Earlier the trial court granted defendant Progressive Marathon Insurance Company's motion for partial summary disposition under MCR 2.116(C)(10) as to plaintiff's claim for uninsured motorist (UM) benefits.[1] We affirm.

## I. FACTUAL BACKGROUND

This case arises out of an automobile accident that took place at around 9 a.m. on Monday, March 13, 2023, in Southfield, Michigan. At that time, Lauren Crawford missed her turn, stopped,

---

[1] The parties' stipulation contained terms that are not delineated in the lower court record, but neither party disputes plaintiff's ability to challenge the trial court's prior order.

failed to recognize that plaintiff's 2007[2] Chevrolet Malibu had stopped behind her, and backed her 2004 Toyota Camry into it.

The responding police officer described the damage to plaintiff's car as being "[m]inor" and neither vehicle's airbags deployed.[3] Plaintiff complained of left shoulder pain to the officer, but refused medical treatment at the scene.

That afternoon, however, plaintiff went to an urgent care, complaining about neck pain, radiating down his right shoulder, but denied having a headache, backache, or muscle pain. As a restrained driver in a motor vehicle accident, plaintiff was diagnosed with "[n]eck strain" and a "[w]hiplash injury to [his] neck[.]" A neck x-ray was taken and plaintiff received an injection. Plaintiff was further instructed to follow up with his primary care physician, was prescribed a muscle relaxant, was instructed about taking ibuprofen or Tylenol as needed, and was told to "take it easy[.]"

After leaving urgent care, plaintiff, who was insured under a policy issued by defendant, called to report the accident. The same day, plaintiff also went to an attorney,[4] who referred him to Northland Radiology.

A week after the accident, plaintiff went to Northland Radiology. There, plaintiff reported that his car was totaled[5] and that he recalled striking his head. Plaintiff complained of headaches as well as neck, mid-back, low-back, right-shoulder, and pelvic pain.

Dr. Benjamin Krpichak observed that plaintiff's head tilted to the right as verified by an x-ray, which also revealed an elevated left shoulder and a higher crest ilium on the right side. The

---

[2] Plaintiff later testified that he believed that his car was a 2005 Malibu.

[3] Plaintiff testified that his car's bumper fell off and was broken. Although photographs of the damage were mentioned, they were not part of the record below.

The damage to defendant's car was "[f]unctional damage," meaning that it affected "some functionality of the vehicle, but the vehicle is still able to be driven from the scene." UD-10 Traffic Crash Report, 2022 Instruction Manual, <https://www.michigan.gov/msp/-/media/Project/Websites/msp/cjic/Traffic-Crash-Reporting-Unit-Files/2022-Manual-FINAL.pdf?rev=cb7f9a6b4c6a4a9b9c572508154e84eb> (accessed December 1, 2025). An example of functional damage is when a car's trunk will not open due to damage from the accident, but the car is drivable. *Id.*

[4] Plaintiff had been involved in an unrelated lawsuit in 2022, but, other than advising that it did not involve another insurance company, he provided no additional information due to a non-disclosure agreement.

[5] Plaintiff later testified that he did not think that he had told the doctor that.

x-ray further showed "slight" deficiencies in plaintiff's "cervical curve" and "lumbar lordosis."[6] Among other things, Dr. Krpichak diagnosed plaintiff with post-traumatic headaches as well as neck, mid-back, low-back, right-shoulder, right hip, and pelvic pain. Dr. Krpichak prescribed a nonsteroidal anti-inflammatory drug and a muscle relaxant. For topical pain, Dr. Krpichak prescribed a LidoPro Patch and pain lotion.[7]

Dr. Krpichak also recommended physical therapy three to four times a week for four to six weeks. And he recommended light duty work for plaintiff, meaning that he should not lift more than 15 pounds, should not perform overhead work, and should limit his bending, leaning, and twisting. Additionally, Dr. Krpichak recommended medical transportation services because "[t]his patient is unable to drive more than 20 miles per day" as well as household replacement services because housework could involve bending, lifting, twisting and prolonged standing, which plaintiff could not perform.

Dr. Krpichak provided plaintiff with a "Patient Limitations Certificate," reflecting that "[a]s a result of the injuries in the accident," it was his opinion that plaintiff was "DISABLED/LIMITED from work/other" and required both household/replacement and transportation services from March 20 through April 21, 2023. Specifically, plaintiff's work restrictions were no excessive or repetitive pushing/pulling, twisting, bending, lifting, no overhead work, and light duty. And, although not checked as a work restriction, it was handwritten that plaintiff not lift more than 15 pounds.

Dr. Krpichak also ordered a series of magnetic resonance imaging (MRI) scans. The cervical MRI showed a "[s]traightened cervical lordosis"[8] and "[m]ultilevel spondylosis."[9] The pelvic MRI revealed a grade-1 strain of plaintiff's left gluteus medius muscle[10] and a small focal posterior labral tear or tears in plaintiff's left hip.[11] The right-hip MRI showed a small focal

---

[6] "Lordosis is the medical definition for the forward curved spine in your neck or lower back." <https://www.my.clevelandclinic.org/health/diseases/23908-lordosis> (accessed December 1, 2025).

[7] Plaintiff later testified that he used the pain lotion once, but he did not use the LidoPro patches.

[8] See footnote 6.

[9] "Cervical spondylosis is the degeneration of the bones and disks in the neck. This condition can lead to a variety of problems, including herniated or bulging disks and bone spurs." <https://www.mayoclinic.org/diseases-condition/cervical-spondylosis/sypmtoms-causes/syc-20370787> (accessed December 1, 2025).

[10] A grade 1 strain "is a mild strain with microtearing of fibers. Less than 5% of muscle fibers are involved. This requires 2 to 3 weeks to heal." *Encyclopedia of Sports Medicine* (ed) available at <https://www.sk.sagepub.com/ency/edvol/sportsmedicine/chpt/gluteal-strain#_> (accessed December 1, 2025).

[11] "A hip labral tear involves the ring of cartilage (labrum) that follows the outside rim of the hip joint socket. Besides cushioning the hip joint, the labrum acts like a rubber seal or gasket to help

posterior superior labral tear as to the acetabular labrum. The remaining MRIs were either negative (brain) or revealed age-related degeneration (lumbar spine and thoracic).[12]

In a follow up visit in early April of 2023, Dr. Krpichak continued his recommendations for plaintiff, including light duty at work, household-replacement services, and medical transportation. A week later, Dr. Krpichak strongly recommended that plaintiff begin "formal physical therapy as soon as possible."

In early May, Dr. Krpichak continued to diagnose plaintiff with "headache, neck pain, mid back pain, low back pain, cervical radiculopathy, [right] shoulder pain, [right] hip pain, [and] pelvic pain." Dr. Krpichak renewed plaintiff's prescriptions and provided another "patient limitations certificate," opining that, "[a]s a result of the injuries in the accident," plaintiff was "DISABLED/LIMITED from work/other" from April 22 through June 9, 2023, with the same restrictions and services contained in the March certificate. Dr. Krpichak also provided a physical therapy requisition form for plaintiff to engage in physical therapy three to four times per week for four to six weeks. Moreover, Dr. Krpichak prescribed chiropractic care two to three times a week for four to six weeks, diagnosing plaintiff with cervical, thoracic, and lumbar pain after a motor vehicle collision.[13]

On May 15, 2023, plaintiff began receiving chiropractic treatment at Vesprini Chiropractic Life Center.[14] During his initial chiropractic visit, plaintiff reported hitting his head on the headrest and injuring his neck, both shoulders, upper back, mid back, and low back. Plaintiff's pain level decreased with treatment.

In mid-July of 2023, plaintiff underwent an insurance medical examination (IME). Plaintiff reported that "his head hit his seat in a forceful way" during the accident. While waiting

---

hold the ball at the top of the thighbone securely within the hip socket." <https://www.mayoclinic.org/diseases-conditions/hip-labral-tear/symptoms-causes/syc-20354873> (accessed December 1, 2025). Common symptoms of a labral tear include "[a] clicking or popping sound and feeling when" moving one's hip. <https://www.my.clevelandclinic.org/health/diseases/17756-hip-labral-tear> (accessed December 1, 2025).

[12] The MRI of plaintiff's right shoulder showed mild osteoarthritis of his acromioclavicular joint and mild intra-articular long head biceps tendinosis. "Biceps tendinosis is caused by degeneration of the tendon from athletics requiring overhead motion or from the normal aging process." Catherine A. Churgay, *Diagnosis and treatment of biceps tendinitis and tendinosis* (2009), p 1, available at <https://www.pubmed.ncbi.nlm.nih.gov/19725288/> (accessed December 1, 2025).

[13] Plaintiff later testified that this referral was so that he could address his "stiffness and everything going on."

[14] The records provided show that chiropractic treatments occurred on May 15, 22, 24, 31, June 7, 12, 14, 21, July 10, 19, 24, 31, and August 16 and 30, 2023. Curiously, plaintiff testified that his last appointment was on August 2, 2023.

for the police, plaintiff explained that he "began experiencing neck, shoulder, back, and hip pains." Plaintiff said that he worked at the Detroit Institute of Arts (DIA) and the Michigan Science Center as a retail associate, disclosing that he had lost one or two days of work and that he continued to work under the 15-pound weight-lifting limitation. The examiner reviewed plaintiff's MRI results and examined plaintiff. The examiner opined that plaintiff's neck pain was secondary to "local strains and sprains[.]" Plaintiff's back pain was secondary to "local sprains and strains with exacerbation of underlying mild facet arthrosis."[15] Plaintiff displayed "some mild facet-based pain" as to both his neck and back. Further, plaintiff's right arm pain was "secondary to local contusion as well as strain and sprains of the right shoulder." Plaintiff "display[ed] some mild right shoulder impingement syndrome." The examiner further opined that plaintiff's "presenting symptoms are causally related to his motor vehicle accident[.]" Even so, plaintiff's prognosis was "excellent" due to his age and his "self-reported improvement over the last several months[.]" Although the examiner opined that plaintiff "did not sustain any permanent impairments," he did "sustain temporary impairments including diffuse sprains and strains for up to a six-month period" following the accident. And while plaintiff would not have required attendant or nursing care services, he "would have required a roughly one-month period of replacement services for assistance with home activities that required prolonged standing, heavy lifting greater than 20 pounds as well as any repetitive upper extremity use or overhead activities." Finally, the examiner opined that plaintiff had not reached pre-accident status, but he "should do so with the initiation of a short formal physical therapy program for shoulder, cervical, and lumbar stabilization for a four- to six-week period."

In November 2023, plaintiff sued Crawford and defendant. As to defendant, plaintiff brought claims for breach of contract, for declaratory relief for damages under the no-fault act, MCL 500.3101 *et seq.*, and for UM benefits.

In April 2024, plaintiff was deposed. Plaintiff testified that he had no neck, back, right arm, or right hip pain before the accident. In the accident, plaintiff injured his right arm, which was on the steering wheel to honk his horn, and his leg/foot, which he was using to attempt to back up or release his brake. Plaintiff also moved forward in his seat before being "jerked back into [his] seat." Contrary to earlier reports that plaintiff was restrained, plaintiff testified that he was not wearing his seatbelt. And, although the police report reflected that plaintiff complained of left shoulder pain, he testified that he complained of stiffness and numbness to his arm, neck, hip, and leg to the responding officer.

Plaintiff stopped the chiropractic treatments after three months because he "was starting to feel better" and it encroached into his time given the other things that he had to do. Plaintiff had not engaged in physical therapy and had been informed by "the guy from radiology" that the tear in his hip was "just going to take forever to heal." Plaintiff testified that his hip was not painful; however, it made a "popping" sound "a lot now ever since the accident." Similarly, plaintiff's

---

[15] "Facet arthrosis, also know as facet joint osteoarthritis, occurs when the cartilage in the small joints of the spine wears down over time." <https://www.bluelinemedicalchi.com/conditions/facet-arthrosis-arthritic-pain-of-major-joints/> (accessed December 1, 2025).

neck pain had subsided, but he had cracking and "popping everywhere," including his arm, and had been told it would not go away. Furthermore, plaintiff's back pain had subsided, but he had "back problems" "in general" without explaining what they were. At that time, plaintiff was not treating with anyone for injuries incurred in the accident. Plaintiff did not have any scarring from the accident and denied having visible bruising afterward.

When the accident occurred, plaintiff was living with his mother and he was not claiming that he had any household-replacement or attendant-care services. Plaintiff missed a single work day due to the accident and followed the weight-lifting restrictions while treating with the chiropractor. Basically, this meant that plaintiff did not perform the restocking or shipping functions of his part-time job at the DIA.[16] Plaintiff also had freelance work that required heavy lifting so he stopped doing that for "[j]ust about a month. So basically, the rest of March. That was about it." Plaintiff later clarified that he did not turn down any freelance jobs because of his injuries, but decided to stop looking for those intermittent opportunities "for a second."

Asked specifically what he was able to do before the accident that he could not do after it occurred, plaintiff responded: "Nothing specific." Later, plaintiff said that the only thing he was no longer able to do was "not popping[.]" Plaintiff had no plan to engage in physical therapy, instead choosing to participate in chiropractic visits. Moreover, plaintiff had no driving or weight-lifting limitations, even though the chiropractor had advised plaintiff to "stretch a little bit" before "any heavy lifting" or doing something strenuous.

In July 2024, defendant moved for partial summary disposition of plaintiff's UM claim under MCR 2.116(C)(10). Defendant argued that: (1) plaintiff's claimed limitations were "not supported by actual objective and diagnostic evidence (i.e., something more than his reported symptoms and history)," (2) plaintiff failed to establish that "any of his injuries had affected his ability to lead his normal life," and (3) the imaging performed on plaintiff after the accident did not demonstrate that his injuries "were conclusively caused by the motor vehicle accident."

Plaintiff opposed defendant's motion. In plaintiff's view, the medical and IME records showed that he suffered an objectively manifested impairment of an important body function. Moreover, his general ability to lead his normal life was affected, albeit temporarily, as shown by his post-accident joint-popping, his employment restrictions, and his inability to perform freelance work.

Without oral argument, the trial court granted defendant's motion. It determined that "[p]laintiff has failed to establish that he sustained a serious impairment of body function, i.e., an objectively manifested impairment of an important body function that affect[ed] [p]laintiff's general ability to lead his normal life." Plaintiff challenges that determination.

## II. THRESHOLD INJURY

---

[16] Plaintiff worked twenty to twenty-five hours per week at the DIA.

-6-

Plaintiff contends that the trial court erred in granting summary disposition because he suffered an objectively manifested impairment of a body function under MCL 500.3135. We disagree.

## A. STANDARD OF REVIEW

"We review de novo a trial court's decision on a motion for summary disposition, reviewing the record in the same manner as must the trial court to determine whether the movant was entitled to judgment as a matter of law." *Bronson Methodist Hosp v Auto-Owners Ins Co*, 295 Mich App 431, 440; 814 NW2d 670 (2012). "Our review is limited to the evidence that had been presented to the circuit court at the time the motion was decided." *Innovative Adult Foster Care, Inc v Ragin*, 285 Mich App 466, 475-476; 776 NW2d 398 (2009). The moving party "has the initial burden of supporting its position by affidavits, depositions, admissions, or other documentary evidence." *Id*. at 475. If the movant meets this initial burden, "the burden shifts to the nonmoving party to establish the existence of a genuine issue of material fact for trial." *Id*.

Under MCR 2.116(C)(10), a trial court may grant summary disposition in favor of the moving party when, "[e]xcept as to the amount of damages, there is no genuine issue as to any material fact, and the moving party is entitled to judgment or partial judgment as a matter of law." "In reviewing a motion brought under MCR 2.116(C)(10), we review the evidence submitted by the parties in a light most favorable to the nonmoving party to determine whether there is a genuine issue regarding any material fact." *Cuddington v United Health Servs, Inc*, 298 Mich App 264, 270; 826 NW2d 519 (2012). "A genuine issue of material fact exists when the record leaves open an issue on which reasonable minds could differ." *Id*. at 270-271 (quotation marks and citation omitted).

## B. ANALYSIS

"Neither uninsured motorist (UM) coverage nor [underinsured motorist] coverage is required by Michigan law, and therefore the terms of coverage are controlled by the language of the contract itself, not by statute." *Andreson v Progressive Marathon Ins Co*, 322 Mich App 76, 84-85; 910 NW2d 691 (2017) (quotation marks and citation omitted). "Therefore, the purpose of the no-fault act, [MCL 500.3101 *et seq*.,] which is to broadly provide coverage for those injured in motor vehicle accidents without regard to fault, does not also apply to uninsured motorist policies." *Cole v Auto-Owners Ins Co*, 272 Mich App 50, 55; 723 NW2d 922 (2006) (citation omitted). "Uninsured motorist insurance permits an injured motorist to obtain coverage from his or her own insurance company to the extent that a third-party claim would be permitted against the uninsured at-fault driver." *Rory v Continental Ins Co*, 473 Mich 457, 465-466; 703 NW2d 23 (2005).

For the purposes of this appeal, the parties do not dispute that plaintiff was covered by an automobile insurance policy issued by defendant that provided UM coverage for plaintiff because Crawford was uninsured. Instead, the parties contest whether plaintiff could successfully bring a third-party claim against Crawford, which plaintiff would be required to do to be entitled to UM benefits.

The no-fault act limits third-party tort liability to certain circumstances enumerated in MCL 500.3135. "A person remains subject to tort liability for noneconomic loss caused by his or her ownership, maintenance, or use of a motor vehicle only if the injured person has suffered death, serious impairment of body function, or permanent serious disfigurement." MCL 500.3135(1).

The issue of whether an injured person suffered a serious impairment of body function is a question "of law for the court if the court finds" that there "is a factual dispute concerning the nature and extent of the person's injuries, but the dispute is not material to the determination whether the person has suffered a serious impairment of body function . . . ." MCL 500.3135(2)(a)(*ii*). In this case, the circuit court recognized that the parties disputed the nature and extent of plaintiff's injuries, but it determined that their factual dispute was not material to the determination of whether plaintiff suffered a serious impairment of body function.

To show a "serious impairment of body function," under MCL 500.3135(5), a plaintiff must establish three elements:

(a) It is objectively manifested, meaning it is observable or perceivable from actual symptoms or conditions by someone other than the injured person.

(b) It is an impairment of an important body function, which is a body function of great value, significance, or consequence to the injured person.

(c) It affects the injured person's general ability to lead his or her normal life, meaning it has had an influence on some of the person's capacity to live in his or her normal manner of living. Although temporal considerations may be relevant, there is no temporal requirement for how long an impairment must last. This examination is inherently fact and circumstance specific to each injured person, must be conducted on a case-by-case basis, and requires comparison of the injured person's life before and after the incident.

"On its face, the statutory language provides three prongs that are necessary to establish a 'serious impairment of body function': (1) an objectively manifested impairment (2) of an important body function that (3) affects the person's general ability to lead his or her normal life." *McCormick v Carrier*, 487 Mich 180, 195; 795 NW2d 517 (2010).

As to the third prong, plaintiff must be able to demonstrate that his impairment affected his general ability to lead his normal life. MCL 500.3135(5)(c). To determine whether a person's general ability to lead his normal life has been affected, "a comparison of the plaintiff's life before and after the incident" is required. *McCormick*, 487 Mich at 202. The impairment must have "an influence on some of the person's capacity to live in his . . . normal manner of living." *Id*.

Plaintiff has not demonstrated that this accident affected his general ability to lead his normal life. Critically, when asked what he was able to do before the accident that he can no

longer do, plaintiff answered, "[n]othing specific."[17]  Recognizing that plaintiff was temporarily limited in performing two aspects of his multi-task, part-time job[18] during the months he treated with the chiropractor, plaintiff only missed a single day of work.  Plaintiff also refrained from looking for secondary work as a freelance production assistant "for basically the rest of March" because such work could involve lifting heavy cases.  But plaintiff never actually turned down a freelance job and admitted that these job opportunities were "infrequent," occurring twice in a month, if he was "super lucky."  Moreover, despite Dr. Krpichak's recommendations for household replacement and transportation services along with the chiropractor's statements that plaintiff needed household services from May 15 through August 31, 2023, plaintiff testified that he was not making a claim for either.  As to the transportation services, plaintiff testified that he drove himself even though it was uncomfortable to sit in the driver's seat of his car, referencing the pain injection that he had received at the hospital.  Further, there was no evidence of hobbies or activities that plaintiff was unable to engage in after the accident, including networking mixers and consumption of entertainment for plaintiff's "actual career[.]"  Indeed, plaintiff testified that he did not engage in sports, work out, or participate in social clubs.

Thus, there is no evidence that the accident resulted in plaintiff having continuing difficulties at home, at work, or in any other setting.  As plaintiff has not established a factual

---

[17] Although plaintiff later referenced his prior lack of "popping" "everywhere," the medical records reflect that plaintiff mentioned "popping" his neck during his final visit with Dr. Krpichak on April 10, 2023.  Plaintiff later testified that while his hips were "not painful," they popped "a lot now ever since the accident."  Plaintiff further testified that he had popping and cracking in his arm and neck as well.  And he explained that he had limited himself in lifting "stuff because of the popping that started[.]"  The example plaintiff gave related to "basically" not stocking or shipping as part of his job duties because plaintiff was lifting nothing heavy at his home on a daily basis.

[18] Plaintiff described his duties as opening the store, closing it, handling cash, restocking, shipping, guest customer service, answering the phone, and "stuff like that."  Plaintiff "just basically wasn't doing restock or shipping anymore."

It is unclear from the record exactly how long plaintiff refrained from lifting 15-pound objects. Dr. Krpichak's limitations certificates were in effect from March 20 through June 9, 2023; however, plaintiff told the IME doctor that he was continuing with his work restrictions on July 17, 2023.  But plaintiff also testified that they ended while he was treating with the chiropractor, which plaintiff believed ended on August 2, 2023, even though the records reflect that it was August 31, 2023.

dispute as to this third element, plaintiff has not established a serious impairment of a body function.[19] Accordingly, the circuit court properly granted defendant's motion for partial summary disposition of plaintiff's claim for UM benefits.

Affirmed.

/s/ Matthew S. Ackerman
/s/ Stephen L. Borrello
/s/ Anica Letica

---

[19] Given this, we need not address the parties' arguments regarding the other requirements under MCL 500.3135(5).